IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| In re: | * | |
| GOLDEN KEY GROUP, LLC | * | Case No: 23-10414-MCR |
| | | (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

DEBTOR'S SECOND AMENDED 100% PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED
STATES BANKRUPTCY CODE DATED FEBRUARY 26, 2024

Golden Key Group, LLC, as debtor and debtor in possession (the "Debtor"), by counsel, proposes this Second Amended 100% Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Dated February 26, 2024[1] (the "Plan").

INTRODUCTION

The Debtor is a professional services firm dedicated to helping federal and commercial clients solve today's strategic, organizational, and operational challenges while addressing their future needs. The Debtor offers its clients solutions including Human Capital Management (HCM) Support, Operational Human Resources (OHR), Executive Search and Full Lifecycle Recruiting Support Services, Employee Training and Leadership Development, Professional Consulting Services, Program Management Office (PMO) Support, Assisted Acquisition and Category Management Development, Workforce and Data Analytics, and System's Integration and Technology Enablement.[2]  The Debtor commenced its Bankruptcy Case by filing a voluntary Chapter 11 petition on January 20, 2023 (the "Petition Date") under the United States Bankruptcy Code. The Debtor continues to manage its assets and financial affairs as a debtor in possession pursuant to §§ 1107(a) and 1108.

This is the Debtor's Plan, and it provides for the preservation and continuation of the Debtor's business through a comprehensive reorganization that anticipates a 100% Distribution to the Holders of Allowed Claims. The Plan is the result of extensive negotiations with the Committee (as defined in Section 1.1.27 herein) and is supported by the Committee as

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq*. as currently in effect.
[2] Unless otherwise defined in this Plan, the definitions of the capitalized terms contained in this Plan are set forth in Article 1 herein.

being in the best interest of creditors. Therefore, the Committee intends to withdraw its proposed Plan and proceed with a consensual plan. Distributions will be made under this Plan to Holders of Allowed Claims in accordance with their rights under this Plan and consistent with priorities under the Bankruptcy Code and under other applicable law.

Subject to certain restrictions and requirements as set forth in § 1127, Federal Rule of Bankruptcy Procedure ("Fed.R.Bankr.P.") 3019, and those restrictions on modifications to the Plan, as set forth herein, the Debtor expressly reserves the right to alter, amend, modify, revoke, or withdraw the Plan, one or more times, prior to Confirmation.

IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER, FASTER AND MORE CERTAIN RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR, ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS, OR ANY FUTURE ACTIONS, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, ESTOPPEL, OR WAIVER.

## ARTICLE 1
### DEFINITIONS AND RULES OF CONSTRUCTION

1.1    Definitions. Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and plural forms of such terms and to all genders:

1.1.1    "Administrative Expense Claim" means a Claim for costs and expenses of the administration of the Bankruptcy Case which is entitled to administrative priority status pursuant to §§ 503(b) and 507(a)(2), including, without limitation, a Claim of a Professional employed at the expense of the Estate and any fees or charges asserted against the Estate under 28 U.S.C. § 1930.

1.1.2    "Administrative Expense Claim Bar Date" means the business day which is thirty (30) days after the Effective Date, or such other dates as approved by order of the Bankruptcy Court.

1.1.3    "Affiliate" means any Person that is an "affiliate" within the meaning of § 101(2).

1.1.4    "Allowed Amount" means the dollar amount in which a Claim is Allowed.

1.1.5    "Allowed" with respect to any Claim means:  (i) a Claim against the Debtor which has been listed on the Debtor's Schedules, as such Schedules may be amended from time to time pursuant to Fed.R.Bankr.P. 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance is made by the Debtor or a Party in Interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder or (iii) any Claim expressly allowed by a Final Order or pursuant to the Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtor and without any further notice to or action, order, or approval of the Bankruptcy Court.

1.1.6    "Allowed Class [#] Claim" means an Allowed Claim in the particular Class identified.

1.1.7 "<u>Applicable Federal Judgment Rate</u>" means the Federal Judgment Rate in effect on the Effective Date.

1.1.8 "<u>A/R Funding</u>" shall mean Associated Receivables Funding, Inc., a South Carolina corporation.

1.1.9 "<u>Army-ROTC</u>" means the United States Army Reserve Officers' Training Corp. program.

1.1.10 "<u>ATF</u>" means the Bureau of Alcohol, Tobacco, Firearms and Explosives.

1.1.11 "<u>Avoidance Actions</u>" means any and all actual or potential Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including actions or remedies under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553(b) of the Bankruptcy Code or under similar or related state, federal or foreign statutes or common law, including fraudulent transfer laws.

1.1.12 "<u>Ballot</u>" means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each Holder of a Claim entitled to vote to accept or reject this Plan.

1.1.13 "<u>Bankruptcy Case</u>" means the Chapter 11 bankruptcy case commenced by the Debtor on the Petition Date and pending before the Bankruptcy Court as Case No. 23-10414-MCR.

1.1.14 "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as in effect on the Petition Date, together with all amendments and modifications thereto.

1.1.15 "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Maryland or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Case.

1.1.16 "<u>Bankruptcy Rules</u>" means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under 28 U.S.C. § 2075, (b) the Federal Rules of Civil Procedure, as amended and promulgated under 28 U.S.C. § 2072, (c) the Local Rules of the Bankruptcy Court, and (d) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date,

together with all amendments and modifications thereto to the extent applicable to the Bankruptcy Case or proceedings herein, as the case may be.

       1.1.17  "Bar Date" means the last date for Creditors whose Claims or interests are not scheduled or are scheduled as disputed, contingent, or unliquidated in the Debtor's Schedules to file Proofs of Claim. The Bar Date is (i) May 15, 2023, for Persons other than governmental entities and (ii) July 19, 2023, for governmental entities.

       1.1.18  "Business Day" means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Fed.R.Bankr.P. 9006(a)(6)), or (d) a day on which commercial banks in Maryland are required or authorized to close by law.

       1.1.19  "Business Documents" means the articles of organization, which may include, but is not limited to; operating agreement, bylaws, and such other applicable formation  documents of the Debtor.

       1.1.20  "Cash" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles consistently applied, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check drawn on a domestic bank.

       1.1.21  "Cash Collateral Order" means an order entered by the Bankruptcy Court authorizing the Debtor's use of cash that a creditor asserts a lien or interest in and which is entitled to recognition under 11 USC§ 363 of the Bankruptcy Code.

       1.1.22  "Claim" has the meaning ascribed to such term in § 101(5).

       1.1.23  "Class" means a category of Claims classified in Article 4 of this Plan pursuant to §§ 1122 and 1123.

       1.1.24  "Clerk" means the Clerk of the Bankruptcy Court.

       1.1.25  "Clerk's Office" means the Office of the Clerk of the Bankruptcy Court.

       1.1.26  "Collateral" means all of the Debtor's assets, including without limitation, accounts, general intangibles, chattel paper, assessments, fixtures, equipment and furniture, along with the proceeds of such assets in which the Estate has (or had) an interest and

that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

        1.1.27  "Committee" means the Official Committee of Unsecured of this Case, appointed by the United States Trustee via the Notice of Appointment filed on February 3, 2023 [Dkt. #38].

        1.1.28  "COMTek" means the entity Communication Technologies, Inc., plaintiff in the civil action CL-2020-17877 in the Circuit Court of Fairfax County, Virginia.

        1.1.29  "Confirmation" or "Confirmation of the Plan" means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

        1.1.30  "Confirmation Date" means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Fed.R.Bankr.P. 5003(a).

        1.1.31  "Confirmation Hearing" means the hearing which will be held before the Bankruptcy Court to consider Confirmation of the Plan and related matters pursuant to § 1128(a), as such hearing may be adjourned or continued from time to time. The date and time of commencement of the Confirmation Hearing is set forth in the Disclosure Statement Approval Order.

        1.1.32  "Confirmation Order" means the order of the Bankruptcy Court in the Bankruptcy Case confirming the Plan pursuant to § 1129.

        1.1.33  "Creditor" means the Holder of a Claim, within the meaning of § 101(10), including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Tax Claims, and Priority Claims.

        1.1.34  "Debtor" means Golden Key Group, LLC, as debtor and debtor in possession under the Bankruptcy Case. For the purpose of this Plan, reference to "Debtor" shall include the Reorganized Debtor, as applicable.

        1.1.35  "DIA" means the Defense Intelligence Agency of the United States Department of Defense.

        1.1.36  "DIP" means debtor-in-possession, as defined in 11 U.S.C. §1101(1).

        1.1.37  "DIP Facility" means the post-petition factoring agreement provided by A/R Funding to the Debtor during this Chapter 11 Case, pursuant to the DIP Financing Agreement and the DIP Financing Order.

1.1.38  "DIP Financing Agreement" means the debtor in possession agreement, dated as of February 3, 2023, as amended, modified, or otherwise supplemented from time to time, by and among the Debtor, as the borrower and A/R Funding.

1.1.39  "DIP Financing Fees and Expenses" means all reasonable fees, costs, charges, and expenses required to be paid by the Debtor under the terms of the DIP Financing Agreement and/or any separate contract executed in connection therewith.

1.1.40  "DIP Financing Order" means the Final Order Granting Debtor's Emergency Motion for Authority to Incur Secured Debt and to Grant Priority and Liens Pursuant to 11 U.S.C. § 364(c) and (d) [Dkt. # 127] entered on April 11, 2023, and as amended, modified, or supplemented by the Bankruptcy Court from time to time.

1.1.41  "DIP Lender Claims" means all Claims against the Debtor arising pursuant to the DIP Financing Agreement, including all obligations therein.

1.1.42  "DIP Lender" means A/R Funding, the lender under the DIP Financing Agreement.

1.1.43  "Disallowed Claim" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

1.1.44  "Disclosure Statement" means that certain Disclosure Statement for Debtor's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, including all Exhibits thereto, as submitted and filed by the Debtor pursuant to § 1125 and approved by the Bankruptcy Court in the Disclosure Statement Approval Order.

1.1.45  "Disclosure Statement Approval Order" means that certain order of the Bankruptcy Court, dated l ____, 2024, approving, among other things, the Disclosure Statement as containing adequate information pursuant to § 1125, and setting various deadlines in connection with final approval of the Disclosure Statement and Confirmation of the Plan.

1.1.46  "Disputed Claim" means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or

(iii) sustained by an order of the Bankruptcy Court. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection.

        1.1.47  "Disputed," when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

        1.1.48  "Disputed Claims Reserve" means Cash to be set aside by the Debtor in a separate, interest-bearing account, in an amount sufficient to pay Disputed Claims in accordance with the provisions hereof, and as to be maintained as set forth more fully herein.

        1.1.49  "Distribution" means the Cash that is required to be distributed under this Plan to the Holders of Allowed Claims.

        1.1.50  "Distribution Date" means the date or dates under the Plan when a Distribution is required to be made in accordance with the Plan.

        1.1.51  "DOC" means the Department of Commerce of the United States of America.

        1.1.52  "DOC PP&B" means the DOC Processing, Payroll, and Benefits program.

        1.1.53  "Docket" means the docket in the Bankruptcy Case maintained by the Clerk.

        1.1.54  "DOC TA" means the DOC Talent Acquisition program.

        1.1.55  "DOD USAR" means the Department of Defense U.S. Army Reserve program.

        1.1.56  "Effective Date" shall mean a date selected by the Debtor that is less than sixty (60) days after the confirmation of the Plan. The Debtor will file a notice of Effective Date following the confirmation of the Plan.

        1.1.57  "Entity" has the meaning ascribed to such term in § 101(15).

        1.1.58  "Equity Interests" means the Holders of ownership interest (i.e. members) in the Debtor.

        1.1.59  "Estate" means the Debtor's bankruptcy estate created pursuant to § 541(a).

1.1.60  "Exculpated Parties" has the meaning ascribed to such term in Article 10.

1.1.61  "Exhibit" means an exhibit to the Disclosure Statement or this Plan, as applicable.

1.1.62  "Federal Judgment Rate" means the interest rate that applies to federal judgments pursuant to 28 U.S.C. § 1961.

1.1.63  "Final Order" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof or file a petition for certiorari has expired; (ii) in the event of a motion for reconsideration or rehearing or petition for certiorari is filed, such motion or petition shall have been denied by an order or judgment of the Bankruptcy Court or other applicable court; or (iii) in the event an appeal is filed and pending, a stay pending appeal has not been entered; provided, however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable; and provided further, however, that the possibility that a motion under Fed.R.Civ.P. 59 or 60, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

1.1.64  "GKG" means the debtor, Golden Key Group, LLC.

1.1.65  "Governmental Unit" has the meaning ascribed to such term in § 101(27).

1.1.66  "Holder" means as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court, (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the Debtor or Reorganized Debtor, as the case may be, has received sufficient written evidence of such assignment or transfer, the assignee or transferee; or (iv) any subrogee of a holder of a Secured Claim.

1.1.67  "Impaired" refers to any Claim that is impaired within the meaning of § 1124.

1.1.68  "Indemnification Rights" means any obligations or rights of the Debtor to indemnify, reimburse, advance, or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to the Debtor's Business Documents, or policy of providing indemnification, applicable law, or a specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of the Debtor.

1.1.69  "Indemnitee" means all present and former directors, officers, members, managers, partners, employees, agents, or representatives of the Debtor who are entitled to assert Indemnification Rights.

1.1.70  "Liabilities" means any and all liabilities, obligations, judgments, damages, charges, costs, debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtor or any predecessor thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtor or any predecessor thereof, any Property of the Debtor, the businesses or operations of the Debtor, the Bankruptcy Case, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligations of the Reorganized Debtor expressly set forth in the Plan or the Plan Documents.

1.1.71  "Lien" has the meaning ascribed to such term in § 101(37).

1.1.72  "Monthly Plan Payment" shall mean the required $100,000 monthly payment earmarked for Creditors with Allowed Claims.

1.1.73  "New Equity Interests" means the membership interests of the Reorganized Debtor owned by Gretchen McCracken.

1.1.74  "New Value" means the value being contributed by Gretchen McCracken for the reissuance of ownership interests in the Reorganized Debtor, which includes a Non-Recourse Guaranty, Pledge Agreement, and such other documents as shall be necessary to effectuate a pledge of the New Equity Interests to secure all payments due under the Plan.

1.1.75  "<u>NIH NIAID</u>" means the National Institutes of Health, National Institute of Allergy and Infectious Diseases program.

1.1.76  "<u>NIH ODEO</u>" means the National Institutes of Health, Executive Office program.

1.1.77  "<u>NOAA SASH</u>" means the National Oceanic and Atmospheric Administration Sexual Assault and Sexual Harassment Prevention program.

1.1.78  "<u>NTSB</u>" means the National Transportation Safety Board.

1.1.79  "<u>Official Bankruptcy Forms</u>" means forms promulgated and required by the Bankruptcy Court.

1.1.80  "<u>Operating Reserve Fund</u>" is a fund of Cash to be held and maintained by the Debtor to stabilize the Debtor's finances by providing for unexpected cash flow shortages, expenses, or losses.

1.1.81  "<u>Other Priority Claim</u>" means a Claim that is entitled to priority in payment pursuant to § 507(a) that is not an Administrative Expense Claim or a Priority Tax Claim or specified in § 1123(a)(1).

1.1.82  "<u>Paid in Full</u>" means the Debtor's payment obligation to a particular Creditor or Class of Creditors under this Plan has been fully satisfied.

1.1.83  "<u>Plan Administrator</u>" means the Person or Entity, or any successor thereto, designated to serve as Plan Administrator under the Plan. The identity of and terms of compensation for the Plan Administrator shall be included in the Plan Supplement.

1.1.84  "<u>Plan Term</u>" shall mean sixty (60) months after the Effective Date as the same may be extended by the Plan Administrator for six (6) additional months for reasonable business purposes pursuant to Article 5.4 of the Plan.

1.1.85  "<u>Party in Interest</u>" means the Debtor, the Reorganized Debtor, any Creditor of any of them, and any party to an executory contract or unexpired lease with the Debtor.

1.1.86  "<u>Person</u>" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency, or political subdivision thereof, or any Entity or other institution of any type whatsoever, including any "person" as such term is defined in § 101(41).

1.1.87  "Petition Date" means January 20, 2023, the date on which the Debtor commenced the Bankruptcy Case.

1.1.88  "Plan" means this Debtor's Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated as of October 2, 2023, as the same may be amended, supplemented, modified, or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

1.1.89  "Plan Documents" means all documents that aid in effectuating the Plan.

1.1.90  "Prepetition" means arising or accruing prior to the Petition Date.

1.1.91  "Priority Claim" means a Claim, other than an Administrative Expense Claim or Priority Tax Claim, entitled to priority in payment pursuant to § 507.

1.1.92  "Priority Tax Claim" means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to § 507(a)(8).

1.1.93  "Professional" means any Person employed in the Bankruptcy Case pursuant to a Final Order of the Bankruptcy Court in accordance with §§ 327 or 1103.

1.1.94  "Projections" means the Projections of Debtor's income and expenditures for payment to Creditors under this Plan, which are projected targets and expected to vary, and which are attached as Exhibit 2 to the Disclosure Statement.

1.1.95  "Proof of Claim" means a proof of claim filed by a Creditor with the Bankruptcy Court in which the Creditor sets forth the amount of its Claim in accordance with Fed.R.Bankr.P. 3001, 3002 or 3003.

1.1.96  "Property" means any property or asset of any kind, whether real, personal, or mixed, tangible, or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

1.1.97  "Quarterly Excess Cash Payment" shall mean a quarterly additional payment to Creditors under the Plan which consists of all excess cash over $2,500,000 and above the base cash reserve requirement of $2,500,000 in summation of the Debtor's bank accounts that is needed to maintain the Debtor's operations. The Quarterly Excess Cash Payment is measured at each quarterly end and is payable in the following month.

1.1.98  "Reorganized Debtor" means the Debtor, as reorganized under the terms of this Plan, on and after the Effective Date.

1.1.99  "Schedules" means the schedules of assets and liabilities and the statement of financial affairs filed by Debtor pursuant to § 521, Fed.R.Bankr.P. 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time through the Confirmation Date.

1.1.100  "Secured Claim" means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under § 553, but with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estate's interest in such Collateral or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estate's interest in such Collateral, or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

1.1.101  "Secured Creditor" means any Creditor holding a Secured Claim.

1.1.102  "Semi-Annual Plan Payment" shall mean the payments required to be made during the months of July and January of each calendar year, starting in July 2024, which are earmarked for Creditors with Allowed Claims.  If at any time the cumulative amount of Quarterly Excess Cash payments and previous Semi-Annual Plan Payments is greater than the cumulative amount of Semi-Annual Plan Payments required by the Plan at that time, then no additional Semi-Annual Plan Payment is due for that semi-annual period.  If there are never any Excess Cash Payments, then the Reorganized Debtor shall make the Semi-Annual Plan Payments.

1.1.103  "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation, and withholding tax. "Tax" shall include any interest or additions attributable to, or imposed on or with respect to, such assessments.

1.1.104  "Tax Claims" means any Claim, pre-petition, or post-petition, relating to a Tax.

1.1.105  "Unimpaired" refers to a Claim that is not Impaired.

1.1.106   "Unsecured Claim" means any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, or a Secured Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under § 365, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estate's interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to § 506(a), (c) any Claim arising from the provision of goods or services to the Debtor prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan.

1.1.107   "Unsecured Creditor" means any Creditor holding an Unsecured Claim.

1.1.108   "U.S. Trustee" means the Office of the United States Trustee.

1.1.109   "Voting Deadline" means the date set by the Bankruptcy Court pursuant to the Disclosure Statement Approval Order by which Ballots for acceptance or rejection of this Plan must be received by the Debtor.

1.2      Rules of Construction. In the event a capitalized term is not defined herein, then it shall have the meaning given in the Bankruptcy Code or the Bankruptcy Rules. In the event a capitalized term is not defined in any of the Plan, the Bankruptcy Code, or the Bankruptcy Rules, then it shall have the meaning such term has in ordinary usage and if one or more meanings for such term exists in ordinary usage, then it shall have the meaning which is most consistent with the purposes of this Plan and the Bankruptcy Code. The terms of this Plan shall not be construed against any Person but shall be given a reasonable construction, consistent with the purposes hereof and of the Bankruptcy Code.

1.2.1   The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained in this Plan.

1.2.2   The word "including" is not a limiting term and shall be interpreted to mean "including, but not limited to."

ARTICLE 2
TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,
PRIORITY CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with the provisions of § 1123(a)(1), Administrative Expense Claims, certain Priority Claims, and Priority Tax Claims are deemed "unclassified." These Claims are not considered Impaired pursuant to § 1129(a)(9)(A) or (C), and Holders of these Claims do not vote on the Plan because they are automatically entitled to specified treatment under the Bankruptcy Code. As such, the Debtor has not placed these Claims in a Class. All Distributions made pursuant to this Article shall be in Cash as described below. Notwithstanding anything to the contrary contained herein, in no event shall the aggregate amount of Distributions with respect to any unclassified Claim exceed the Allowed Amount of such Claim. The treatment of and the consideration to be received by the Holders of these unclassified Claims shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Claims (of any nature whatsoever).

2.1     Allowed Administrative Expense Claims. Each Holder of an Allowed Administrative Expense Claim shall be Paid in Full, in Cash, in accordance with the priority of Distribution set forth in § 507(a), on the latest of (a) the Effective Date, (b) the tenth (10th) Business Day after the date upon which such Claim becomes an Allowed Claim, (c) the date upon which such Allowed Claim becomes due according to its terms, or (d) as otherwise ordered by a Final Order of the Bankruptcy Court. Allowed Administrative Expense Claims representing (a) obligations incurred in the ordinary course of business or assumed by the Debtor will be Paid in Full or performed by the Debtor in the ordinary course of business, consistent with past practice and (b) obligations incurred to Professionals for services provided through the Confirmation Date will be paid in accordance with the applicable Bankruptcy Court order approving the fees and expenses of each such Professional; provided, further, however, that Administrative Expense Claims filed after the Administrative Expense Claim Bar Date will be forever barred and disallowed without further order of the Bankruptcy Court.

In the case of a Professional with an Allowed Administrative Expense Claim, that Professional shall be paid first from any retainer held by such Professional, and as to a balance, if any, after application of the retainer, shall be paid from Cash. Any Holder of an Allowed Administrative Expense Claim may agree to a different, but not better, treatment of its Claim, in which event the Reorganized Debtor shall pay such Claim in accordance with such agreement.

2.1.1    <u>DIP Obligations</u>. All DIP obligations payable under the DIP Financing Agreement and with respect to DIP Financing Fees and Expenses, under the DIP Financing Agreement, and all other DIP Lender Claims are (a) Allowed in full if not otherwise objected to; (b) shall not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity except to the extent outlined in the DIP Financing Order; (c) shall constitute Allowed Administrative Expenses; and (d) shall be Paid in Full, in Cash, on the Effective Date, without the need for application to or approval from any court. Any DIP Obligation shall be paid first from any reserves held by such DIP Lender pursuant to the DIP Financing Agreement, and as to a balance, if any, after application of the reserves, shall be paid from Cash.

2.1.2    <u>Final Application for Compensation and Reimbursement of Professionals' Fees and Expenses</u>. All applications for final allowance of compensation and reimbursement of Professionals' fees and expenses must be filed no later than the Administrative Expense Claim Bar Date and will be subject to the authorization and approval of the Bankruptcy Court. It is contemplated that Frost Law will have an administrative expense claim that will be allowable after this Administrative Expense Claim Bar Date, subject to further order of the Court.

2.2    <u>Allowed Priority Claims</u>. Each Holder of an Allowed Priority Claim, including Allowed Priority Tax Claims due and payable on or before the Effective Date, shall be Paid in Full, in Cash, in accordance with the priority of Distribution set forth in § 507(a), on the latest of (a) the Effective Date, (b) the tenth (10th) Business Day after the date upon which such Claim becomes an Allowed Claim, (c) the date upon which such Allowed Claim becomes due according to its terms, or (d) as otherwise ordered by a Final Order of the Bankruptcy Court. Any Holder of an Allowed Priority Claim may agree to a different, but not better, treatment of its Claim, in which event the Reorganized Debtor shall pay such Claim in accordance with such agreement.

The Debtor does not anticipate any Priority Claims.

## ARTICLE 3
## CLASSIFICATION OF CLAIMS

3.1    <u>General Overview</u>. As required by §§ 1122 and 1123, this Plan places Claims into various Classes according to their right to priority and other relative rights. A Claim is in a particular Class for purposes of voting on, and of receiving Distributions pursuant to the Plan only to the extent such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Administrative Expense Claims and Priority Claims of the kinds specified in § 507(a)(2) and (a)(8) (set forth in Article 2 herein) have not been classified and are excluded from the following classes in accordance with § 1123(a)(l).

3.2    <u>Designation of Classes</u>. This Plan provides for the establishment of the following Classes of Claims:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Secured Claim of Associated Receivables Funding | Unimpaired | No |
| 2 | Unsecured Convenience Claims (Claims under $25,000.00) | Impaired | Yes |
| 3 | Claims for Cure of Assumed Contracts and Unexpired Non-Residential Leases | Impaired | Yes |
| 4 | Claim for M&T Bank Line of Credit | Impaired | Yes |
| 5 | General Unsecured Creditors and Contract Rejection Claims | Impaired | Yes |
| 6 | Disputed General Unsecured Judgment Claim | Impaired | Yes |
| 7 | Equity Interests | Impaired | Yes |

3.3    <u>Classes Not Impaired and Conclusively Presume to Accept this Plan</u>. Under section 1126(f) of the Bankruptcy Code, the Holder of such Claim in Class 1 is not impaired and thus is not entitled to vote. This Class is presumed to accept this Plan.

3.4     <u>Classes Impaired and Entitled to Vote</u>. The following classes of Claims are Impaired and are entitled to vote on the Plan: Classes 2, 3, 4, 5, 6, and 7.

## ARTICLE 4
## TREATMENT OF CLASSIFIED CLAIMS

Allowed Claims shall be treated under this Plan in the manner set forth in this Article. Unless otherwise specified, all Distributions made pursuant to this Article shall be in Cash. Notwithstanding anything to the contrary contained herein, in no event shall the aggregate amount of Distributions with respect to any classified Claim exceed the Allowed Amount of such Claim. The treatment of, and the consideration to be received by, Holders of Allowed Claims hereunder shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims (of any nature whatsoever), including any Liens

securing such Allowed Claims. Any Holder of an Allowed Claim under this Article may agree to a different, but not better, treatment of its Claim, in which event the Reorganized Debtor shall pay such Claim in accordance with such agreement.

### 4.1    Class 1:  Secured Claim of A/R Funding.

A.    <u>Description</u>:  Class 1 consists of the Allowed Secured Claim of the following Claim Holder:

| Secured Claim | Allowed Claim |
|---|---|
| Associated Receivables Funding | $0.00 |
| **Total** | **$0.00** |

B.    <u>Treatment</u>:  The Class 1 Claim Holder was Paid in Full pursuant to the Consent Order Granting (I) Interim Use of Cash Collateral through September 30, 2023, and (II) Granting Adequate Protection [Dkt. # 192] and the Final Order Granting Debtor's Emergency Motion for Authority to Incur Secured Debt and to Grant Priority and Liens Pursuant to 11 U.S.C. § 364(c) and (d) [Dkt. # 127] and will not receive any additional payment under the Plan. The Debtor will continue to operate under the DIP Financing Agreement post-confirmation.

C.    <u>Impairment</u>:  Class 1 is Unimpaired and therefore the Holder of the Allowed Class 1 Claim is not entitled to vote to accept or reject the Plan.

### 4.2    Class 2:  Unsecured Convenience Claims.

A.    <u>Description</u>:  Class 2 consists of the Unsecured Convenience Claims consisting of those Allowed General Unsecured Claims in amounts equal to or less than $25,000.00 and as described *supra*. The anticipated Claims in Class 2 and their treatment are set forth in detail below. If there is no estimated Claim amount shown, then the Debtor's records reflect a zero-balance owed. Some Claims have been satisfied or partially satisfied pursuant to the Bankruptcy Court's Order Authorizing, but Not Directing, the Debtor to Pay Certain Prepetition Claims of Critical Vendors [Dkt. # 161] or the Order Granting Debtor's Emergency Motion for Entry of an Order Authorizing Payment of Prepetition Wages and Compensation in the Ordinary Course [Dkt. # 42].

B.    <u>Treatment</u>:  In full and complete satisfaction, discharge and release of the Class 2 Claims, the Debtor shall pay each Holder of a Class 2 Claim one hundred percent (100%) of its Allowed Claim plus interest at the Applicable Federal Judgment Rate from the

Effective Date, in consecutive monthly installments from the Monthly Plan Payments, the Semi-Annual Plan Payments, or the Quarterly Excess Cash Payment (as such are required under the Plan), commencing the month immediately following Allowed Administrative Expense Claims are Paid in Full. The Debtor estimates that Class 2 will be paid within approximately sixty (60) days after the Effective Date of the Plan. The following chart sets forth the name of the Creditor, the estimated Claim amount, and the percentage that their estimated Claim represents within Class 2:

| Class 2 | | |
|---------|------|------|
| **Creditor** | **Claim (est.)** | **Percentage of Class** |
| 310 Technology, LLC | $ 8,898.24 | 3.9014% |
| Absolute Business Solutions Corporation[3] | $ 23,537.68 | 10.3200% |
| Aliniad Consulting Partners, Inc | $ 7,516.17 | 3.2954% |
| Aronson LLC | $ 5,500.00 | 2.4115% |
| Cambridge Healthtech Institute | $ 1,400.00 | 0.6138% |
| Federal Insurance Company (Chubb)[4] | $ 5,745.78 | 2.5192% |
| Federal Management Partners[5] | $ 17,952.84 | 7.8714% |
| Impact Talent Partners, LLC | $ 15,190.00 | 6.6600% |
| Indoff Inc. | $ 14,480.02 | 6.3487% |
| Leadership Connect, Inc | $ 17,500.00 | 7.6728% |
| Management Analysis Technologies, Inc.[6] | $ 16,438.80 | 7.2075% |
| Michelle Moss | $ 15,680.00 | 6.8748% |
| Omega Plus | $ 1,275.00 | 0.5590% |
| Pearson Business Consulting | $ 6,000.00 | 2.6307% |
| Propaganda3 | $ 14,500.00 | 6.3575% |
| Rick Huntley Consulting, LLC | $ 11,563.89 | 5.0701% |
| SDL Consulting | $ 15,597.50 | 6.8387% |
| Serco, Inc. | $ 12,011.50 | 5.2664% |
| Snowbird Consulting Group (as to NIH ODEO contract only)[7] | $ 10,141.28 | 4.4464% |
| SouthBank Legal (appeal)[8] | $ 4,062.00 | 1.7810% |
| Thompson & Co. Consulting | $ 3,087.50 | 1.3537% |
| ADP Screening & Selection Services | $ - | |
| ADP, Inc. | $ - | |
| APFS Staffing Inc. Addison Group | $ - | |
| Aria Defense Solutions, LLC | $ - | |
| Athena Technology Group | $ - | |
| Baldwin, Carl | $ - | |

---

[3]  Absolute Business Solutions Corp. has a Claim of $30,466.11 but was paid $6,928.43 pursuant to the Critical Vendor Order.

[4]  Chubb has a Claim of $49,084.65 pursuant to Claim #27 but has been paid monthly installments post-petition in an effort for Debtor to maintain its insurance coverage. Chubb confirmed the remaining balance due on August 15, 2023.

[5]  Federal Management Partners has a Claim of $26,691.89 but was paid $8,739.05 pursuant to the Critical Vendor Order.

[6]  Management Analysis Technologies, Inc. has a Claim of $17,798.50 but was paid $1,359.70 pursuant to the Critical Vendor Order.

[7]  Snowbird Consulting Group is subject to two (2) separate contracts with Debtor and as such, each contract is broken out between the applicable classes to which Snowbird is placed. The total Claim of Snowbird is $38,402.92.

[8]  The Allowed Claim of SouthBank Legal is based upon two separate engagements- litigation services and appellate services. *See* Debtor's Application to Employ SouthBank Legal as Special Appellate Counsel [Dkt. # 89], and the Order Granting Debtor's Application to Employ SouthBank Legal as Special Litigation Counsel [Dkt. # 108].

| Class 2 | | |
|---|---|---|
| **Creditor** | **Claim (est.)** | **Percentage of Class** |
| BKM Consulting, LLC | $          - | |
| Blackwell, Denise | $          - | |
| Brown Jr., Daniel W. - Xponential Coaching | $          - | |
| Burn Bright, LLC | $          - | |
| Buttrey, Kathleen Virginia | $          - | |
| Capitol Office Solutions LLC | $          - | |
| Carahsoft Technology Corp. | $          - | |
| Chtd Company | $          - | |
| City of Vine Grove | $          - | |
| Coaching Matters | $          - | |
| Concerted Solutions, Inc. | $          - | |
| Costner, William R. | $          - | |
| CT Corporation System, as rep. (UCC on accounts receivable) | $          - | |
| CT Corporation System | $          - | |
| Datawatch Systems, Inc. | $          - | |
| Delaney, Thomas Kevin | $          - | |
| Deltek | $          - | |
| Donegan, Mari Catherine | $          - | |
| Fidelis Investigations & Consulting, LLC | $          - | |
| Fraczkowski, Melissa A. | $          - | |
| Gail, Judith | $          - | |
| Goldbelt Glacier Health Services, LLC | $          - | |
| HackStone Film Group | $          - | |
| Hostetler Consulting, LLC | $          - | |
| Innovative Management Concepts | $          - | |
| Innovative Outcomes Consulting Inc. | $          - | |
| Integral Development Network, LLC | $          - | |
| J & K Ohana Solutions LLC | $          - | |
| J Shea Inc./Cheers in a Box | $          - | |
| Kastle Systems, LLC | $          - | |
| Manzelmann, James | $          - | |
| Melissa Marshall Consulting, LLC | $          - | |
| MG Independent Consulting | $          - | |
| Microsoft | $          - | |
| Military Hire | $          - | |
| Molden, Charles | $          - | |
| Monster | $          - | |
| Muccio, Aida M. | $          - | |
| NeuroLeadership Institute, Inc. | $          - | |
| NextNow,  LLC | $          - | |
| North South Consulting Group, LLC | $          - | |
| ParkX Management | $          - | |
| Patricia Day Williams & Associates, LLC | $          - | |
| Quadient, Inc. | $          - | |
| Robert B. "Abe" Abrams, LLC | $          - | |
| Rudolph Supply | $          - | |
| Sattler Consulting, LLC | $          - | |
| Schultheis, Nicole | $          - | |
| ServiceMaster NCR | $          - | |
| Shred Instead | $          - | |
| Sparks Group | $          - | |
| Stanton Secure Technologies, LLC | $          - | |
| TechSmith Corporation | $          - | |
| The Infosoft Group LLC dba Circa | $          - | |
| Visual Edge | $          - | |
| Xerox Financial Services | $          - | |
| Comcast Cable Communications, LLC | $          - | |

| Class 2 | | |
|---|---|---|
| **Creditor** | **Claim (est.)** | **Percentage of Class** |
| Ohio Department of Taxation | $          - | |
| IRS | $          - | |
| **TOTAL** | **$   228,078.20** | **100.0000%** |

C.  <u>Convenience Claim Election</u>:  Each Holder of an Allowed Claim in an amount greater than $25,000.00, which would otherwise be an Allowed Claim in any other Class under the Plan, may voluntarily reduce its Claim to $25,000.00, or less, and be treated as a Holder of an Allowed Unsecured Convenience Claim for purposes of this Plan. **Such election must be made on the Ballot and be received by the Debtor on or prior to the Voting Deadline**. Any election after the Voting Deadline shall not be binding upon the Debtor unless the Voting Deadline is expressly waived, in writing, by the Debtor, provided however, that, under no circumstance may such waiver by the Debtor occur on or after the Effective Date.

D.  <u>Contracts Assumed or Rejected</u>: To the extent the holder of an Allowed Claim being paid in Class 2 is subject to a contract with the Debtor, such contract is hereby assumed or rejected pursuant to, and as more fully described, in a filing made at least twenty (20) days prior to the hearing on Confirmation and in accordance with  Article 7 below. The treatment of the contract in Class 2 is a cure of any and all defaults existing on the contract as of the Petition Date. Adequate assurance of future performance shall be the promise of the Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under this Plan, the Debtor's demonstrated performance to date post-petition, and the anticipated ERTC (defined below).

E.  <u>Impairment</u>:  Class 2 is Impaired and, therefore, the Holders of Class 2 Allowed Claims are entitled to vote to accept or reject the Plan.

**4.3    <u>Class 3:  Claims for Cure of Assumed Contracts and Unexpired Non-Residential Leases</u>.**

A.  <u>Description</u>:  Class 3 consists of Claims for the cure of certain Assumed Contracts and Unexpired Non-Residential Leases that relate to essential contracts and leases necessary for the Reorganized Debtor's operations. Holders of Class 3 Claims include, but are not limited to, landlords of the Debtor's four office locations; subcontractors and/or vendors that provide services in support of the Debtor's "back office"; subcontractors and/or vendors providing services under the Debtor's NIH NIAID contract; and subcontractors and/or vendors providing services under the Debtor's DOC PP&B contract. For ease of reference, Creditors with

Claims in this Class are identified below according to which contract they perform services under. They are listed as follows:

(1)    Creditors with Claims under Assumed Nonresidential Leases:

| CREDITORS WITH CLAIMS UNDER ASSUMED NONRESIDENTIAL LEASES | ARREARS |
|---|---|
| BSREP II Md Office | $0.00 |
| CRS Commerce Center/CMC III Depository (Claim #20) | $166,267.32 |
| Daimler Trust (Claim #10) | $0.00 |
| First Citizens (Claim #8) | $0.00[9] |
| PDC Metro East | $0.00 |
| Stonecroft Place, LLC | $0.00 |
| Vista Development (RE/MAX) | $0.00 |
| TOTAL | $166,267.32 |

(2)    Creditors providing support to the Debtor's "back office":

| CREDITORS PROVIDING SUPPORT TO THE DEBTOR'S "BACK OFFICE" | CLAIM |
|---|---|
| Sorrells Advisory Group, LLC (Claim #6) | $69,825.00 |
| TechnoMile, LLC | $29,487.15 |
| TOTAL | $99,312.15 |

(3)    Creditors under the Debtor's NIH NIAD contract:

| CREDITORS UNDER THE DEBTOR'S NIH NIAD CONTRACT | CLAIM |
|---|---|
| Guidehouse, Inc. (Claim #28) | $27,298.34[10] |
| Management Concepts, LLC  (Claim #11) | $111,617.99[11] |
| Snowbird Consulting Group | $28,261.64[12] |
| The Clearing, Inc. (Claim #5) | $34,207.27[13] |
| TOTAL | $201,385.24 |

---

[9]    First Citizens has acknowledged in writing that there are no arrears associated with Claim #8, despite the claim alleging arrears of $21,338.86.

[10]    Guidehouse holds a Claim of $31,006.93 but was paid $3,708.59 pursuant to the Critical Vendor Order.

[11]    Management Concepts holds a Claim of $119,408.53 but was paid $7,790.54 pursuant to the Critical Vendor Order. Management Concepts conducts the bulk of its work for the Debtor in November, resulting in a large invoice issued in January. The amounts owed to Management Concepts are not on account of several unpaid invoices.

[12]    *See* footnote 12.

[13]    The Clearing has a Claim of $35,319.21 but was paid $1,111.94 post-petition.

(4)    Creditors under the Debtor's DOC PP&B contract:

| CREDITORS UNDER THE DEBTOR'S DOC PP&B CONTRACT | CLAIM |
|---|---|
| Aquila Federal Solutions, LLC (Claim #31) | $27,770.72[14] |
| CJSeto Support Services, LLC | $43,237.71 |
| Cornerbrooke, LLC (Claim #14) | $298,938.30[15] |
| Echo Origin, LLC | $43,821.90[16] |
| KAA Federal Solutions  (Claim #23) | $545,370.85[17] |
| Lindholm & Assoc., Inc. (Claim #22) | $243,759.12[18] |
| Manpower Group Public Sector, Inc. (Claim #24) | $680,249.61[19] |
| Peraton, Inc. (Claim #29) | $750,806.11[20] |
| TOTAL | $2,633,954.32 |

B.    Treatment:  In full and complete satisfaction, discharge and release of the Class 3 Claims, the Debtor shall pay each Holder of a Class 3 Claim one hundred percent (100%) of the principal amount of their Allowed Claims, in consecutive equal monthly installments from the Monthly Plan Payments, the Semi-Annual Plan Payments, or the Quarterly Excess Cash Payment (as such are required under the Plan), commencing the month immediately following the Class 2 Allowed Claims being Paid in Full. The Class 3 Claims shall accrue simple interest from the Effective Date at the Applicable Federal Judgment Rate. The following chart sets forth the name of the Creditor, the estimated Claim amount, and the percentage that their estimated Claim represents within Class 3:

| Class 3 | | |
|---|---|---|
| Creditor | Claim (est.) | Percentage of Class |
| CRS Commerce Center/CMC III Depository | $    166,267.32 | 5.36190% |
| Sorrells Advisory Group, LLC | $     69,825.00 | 2.25180% |
| TechnoMile, LLC | $     29,487.15 | 0.95090% |
| Guidehouse, Inc. | $     27,298.34 | 0.88030% |
| Management Concepts, LLC | $    111,617.99 | 3.59950% |
| Snowbird Consulting Group | $     28,261.64 | 0.91140% |

---

[14]    Aquila Federal Solutions has a Claim of $36,489.20 but filed its claim after being paid one half of the amount due under the Critical Vendor Order. Aquila was paid $17,436.96 pursuant to the Critical Vendor Order; the full prepetition claim due was $45,207.68.

[15]    Cornerbrooke has a Claim of $492,358.79. Additionally, Cornerbrooke was paid $22,660.65 pursuant to the Critical Vendor Order, attributable to Debtor's Cornerbrooke contract under the DOC PP&B contract.

[16]    Echo Origin has a Claim of $47,844.20 but was paid $4,022.30 pursuant to the Critical Vendor Order.

[17]    KAA has a Claim of $565,739.73 but filed its claim after being paid one half of the amount due under the Critical Vendor Order. KAA was paid $40,737.76 pursuant to the Critical Vendor Order, the full prepetition claim due was $586,108.61.

[18]    Lindholm has a Claim of $263,284.08 but was paid $19,524.96 pursuant to the Critical Vendor Order, and the Claim as filed includes a $10,000 calculation error.

[19]    Manpower has a Claim of $727,816.74 but was paid $47,567.13 pursuant to the Critical Vendor Order.

[20]    Peraton, Inc. has a Claim of $789,543.55 but was paid $38,737.44 pursuant to the Critical Vendor Order. In addition, Peraton and the Debtor are engaged in discussions which may result in Peraton's being removed from Class 3 and instead be treated as a General Unsecured Claim under Class 5 pursuant to a rejection of its contract. The Debtor anticipates filing a separate motion for approval of its compromise with Peraton.

| Class 3 | | |
|---|---|---|
| **Creditor** | **Claim (est.)** | **Percentage of Class** |
| The Clearing, Inc. | $ 34,207.27 | 1.10310% |
| Aquila Federal Solutions, LLC | $ 27,770.72 | 0.89560% |
| CJSeto Support Services, LLC | $ 43,237.71 | 1.39440% |
| Cornerbrooke, LLC | $ 298,938.30 | 9.64030% |
| Echo Origin, LLC | $ 43,821.90 | 1.41320% |
| KAA Federal Solutions | $ 545,370.85 | 17.58740% |
| Lindholm & Assoc., Inc. | $ 243,759.12 | 7.86090% |
| Manpower Group Public Sector, Inc. | $ 680,249.61 | 21.93700% |
| Peraton, Inc. | $ 750,806.11 | 24.21240% |
| **TOTAL** | **$3,100,919.03** | **100.0001%** |

C.     Assumption of Unexpired Executory Contracts and Leases: To the extent the holder of an Allowed Claim being paid in Class 3 is subject to an unexpired executory contract or lease with the Debtor that has not otherwise expired by its own terms post-petition, such lease is hereby ASSUMED pursuant to, and as more fully described, in Article 7 below.

D.     Impairment:  Class 3 is Impaired and therefore Holders of Class 3 Allowed Claims are entitled to vote to accept or reject the Plan.

### 4.4     Class 4: Claim for M&T Bank Line of Credit.

A.     Description:  Class 4 consists of the Allowed Claim of M&T Bank Line of Credit in the amount of $98,839.38.

B.     Treatment:  In full and complete satisfaction, discharge, and release of the Class 4 Claims, the Debtor shall pay the Holder of the Class 4 Claim one hundred percent (100%) of its Allowed Claim, in consecutive equal monthly installments from the Monthly Plan Payments, the Semi-Annual Plan Payments, or the Quarterly Excess Cash Payments (as such are required under the Plan), commencing the month immediately following the Allowed Claims in Classes 2 and 3 being Paid in Full. The Debtor anticipates that the principal amount of the Allowed Claim owed to the Class 4 Creditor will be paid on or about January 2025. The Class 4 Claim shall accrue simple interest from the Effective Date at the Applicable Federal Judgment Rate.

**Immediately upon the payment in full of the Class 4 Allowed Claim, the M&T Bank Line of Credit shall be re-established and re-opened upon the same terms and credit limits as existed pre-petition. This treatment further facilitates the Debtor's operations and assists with its performance of the Plan.**

The following chart sets forth the name of the Creditor in Class 4, the estimated Claim amount, and the percentage that its estimated Claim represents within Class 4:

| Class 4 | | |
|---|---|---|
| **Creditor** | **Claim (est.)** | **Percentage of Class** |
| M&T Bank Line of Credit | $    98,839.38 | 100.0000% |
| **TOTAL** | **$    98,839.38** | **100.0000%** |

      C.    <u>Impairment</u>:  Class 4 is Impaired and, therefore, the Holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

      **4.5**    **<u>Class 5:  General Unsecured Creditors and Contract Rejection Claims</u>.**

      A.    <u>Description</u>:  Class 5 consists of the Claims of General Unsecured Creditors and Contract Rejection Claims. Claims under this Class are as follows:

| CREDITOR | CLAIM |
|---|---|
| First Citizens (Claim #7) | $25,644.01 |
| Akin Gump Strauss Hauer (Claim #16) | $26,281.00 |
| AMEX (Claim #4) | $133,693.68 |
| Cornerbrooke, LLC[21] (Claim #14) | $110,760.40 |
| Creative Thinking, LLC | $39,587.33 |
| David William McKisick | $26,175.00 |
| Forty Au, LLC | $51,997.50 |
| Knowledge Bank  (Claim #18) | $100,899.74 |
| Libertas (Claim #15) | $601,231.20 |
| OBAN Corp. (Claim #25) | $322,852.39 |
| SouthBank Legal (trial) | $143,198.00 |
| **TOTAL** | **$1,582,320.25** |

      B.    <u>Treatment</u>:  In full and complete satisfaction, discharge and release of the Class 5 Claims, the Debtor shall pay each Holder of a Class 5 Allowed Claim one hundred percent (100%) of its Allowed Claim, in consecutive equal monthly installments from the Monthly Plan Payments, the Semi-Annual Plan Payments, or the Quarterly Excess Cash Payments (as such are required under the Plan), commencing in the month immediately following Class 4 being Paid in Full. Payments will be made on a pro rata basis *pari passu* with Class 6. The Class 5 Claims shall accrue simple interest from the Effective Date at the Applicable Federal Judgment Rate. The Debtor anticipates that Allowed Claims in Class 5 will begin to receive payments on the principal portion of their Allowed Claims upon the Debtor's receipt of the ERTC refund on or about January 2025 and that payments to Class 5 will be completed by January 2028. **In any event, payments of all principal and interest payable to**

---

[21]  Cornerbrooke, LLC is subject to three (3) separate contracts with the Debtor and as such, each contract is broken out between the applicable classes to which Cornerbrooke is placed. The total Claim of Cornerbrooke is $492,358.70 pursuant to Claim #14.

**Class 5 will be completed no later than sixty (60) months following the Effective Date of the Plan, unless extended for six (6) additional months based upon the for reasonable business judgment of the Plan Administrator pursuant to Article 5.4 of the Plan.**

The following chart sets forth the names of the Creditors in Class 5, the estimated Claim amount, and the percentage that their estimated Claim represents within Class 5:

| Class 5 | | |
|---|---|---|
| Creditor | Claim (est.) | Percentage of Class |
| First Citizens | $    25,644.01 | 1.6207% |
| Akin Gump Strauss Hauer | $    26,281.00 | 1.6609% |
| AMEX | $  133,693.68 | 8.4492% |
| Cornerbrooke, LLC | $  110,760.40 | 6.9999% |
| Creative Thinking, LLC | $    39,587.33 | 2.5019% |
| David William McKisick | $    26,175.00 | 1.6542% |
| Forty Au, LLC | $    51,997.50 | 3.2862% |
| Knowledge Bank | $  100,899.74 | 6.3767% |
| Libertas | $  601,231.20 | 37.9968% |
| OBAN Corp. | $  322,852.39 | 20.4037% |
| SouthBank Legal (trial) | $  143,198.00 | 9.0499% |
| **TOTAL** | **$1,582,320.25** | **100.0000%** |

C.    <u>Convenience Claim Election</u>:  Each Holder of an Allowed Claim in an amount greater than $25,000.00, which would otherwise be an Allowed Claim in Class 5, may voluntarily reduce its Claim to $25,000.00, or less, and be treated as a Holder of an Allowed Unsecured Convenience Claim for purposes of this Plan. **Such election must be made on the Ballot and be received by the Debtor on or prior to the Voting Deadline**. Any election after the Voting Deadline shall not be binding upon the Debtor unless the Voting Deadline is expressly waived, in writing, by the Debtor, provided however, that, under no circumstance may such waiver by the Debtor occur on or after the Effective Date.

D.    <u>Contracts Rejected</u>: To the extent the holder of an Allowed Claim being paid in Class 5 is subject to a contract with the Debtor that has not otherwise expired by its own terms post-petition, such contract is hereby REJECTED pursuant to, and as more fully described, in Article 7 below.

E.    <u>Impairment</u>:  Class 5 is Impaired and, therefore, Holders of Class 5 Allowed Claims are entitled to vote to accept or reject the Plan.

### 4.6    <u>Class 6:  Disputed General Unsecured Judgment Claim</u>

A.    <u>Description</u>:  Class 6 consists of the Disputed General Unsecured Judgment Claim held by COMTek on account of a judgment entered in the Circuit Court of Fairfax County, 19th Judicial Circuit of Virginia.  *See* Claim #9 in the amount of $9,008,252.70.

The Debtor has appealed the judgment, and that appeal remains pending. Class 6 is treated as disputed until resolution of the appeal.

| CREDITOR | DISPUTED CLAIM AMOUNT |
|---|---|
| COMTek (Claim #9) | $9,008,252.70 |
| **TOTAL** | **$9,008,252.70** |

B.      Treatment:  In full and complete satisfaction, discharge and release of the Class 6 Claim, the Debtor shall pay the Holder of the Class 6 Claim one hundred percent (100%) of its Allowed General Unsecured Claim, in consecutive equal monthly installments, from the Monthly Plan Payments, the Semi-Annual Plan Payments, the Quarterly Excess Cash Payments (as such are required under the Plan), commencing in the month immediately following Class 4 being Paid in Full. Payments will be made on a pro rata basis *pari passu* with Class 5. The Class 6 Claim shall accrue simple interest from the Effective Date at the Applicable Federal Judgment Rate. Interest will be paid after the principal amounts of all Allowed Claims in all Classes have been paid in full. The Debtor anticipates that the Allowed Claim in Class 6 will begin to receive payments on the principal portion of its Allowed Claim upon the Debtor's receipt of the ERTC refund on or about January 2025 and that payments to Class 6 will be completed by January 2028 **In any event, payments of all principal and interest payable to Class 6 will be completed no later than sixty (60) months following the Effective Date of the Plan, unless extended for six (6) additional months based upon the for reasonable business judgment of the Plan Administrator pursuant to Article 5.4 of the Plan.**

The following chart sets forth the name of the Creditor in Class 6, the estimated Claim amount, and the percentage that its estimated Claim represents within Class 6:

| Class 6 | Claim (est.) | Percentage of Class |
|---|---|---|
| COMTek | $9,008,252.70 | 100.0000% |
| **TOTAL** | **$9,008,252.70** | **100.0000%** |

Payments to Class 6 will not begin unless and until the Claim is Allowed by Final Order and, if payments are scheduled to begin prior to the Claim becoming an Allowed Claim, the Debtor will deposit funds pursuant to the Disputed Claims Reserve.

C.      Impairment:  Class 6 is Impaired and, therefore, the Holder of the Class 6 Allowed Claim is entitled to vote to accept or reject the Plan.

4.10    **Class 7: Interests.**

       A.    <u>Description</u>:  Class 7 consists of all Equity Interests in the Debtor.

       B.    <u>Treatment</u>.  On or after the Effective Date, Equity Interests in the Debtor shall be extinguished, and Holders thereof shall not receive any Distribution with respect to their Interest held in the Debtor. The Reorganized Debtor shall issue new Equity Interests to Ms. Gretchen McCracken.  Such interests shall be pledged to secure the performance of the Plan. In order to receive the New Equity Interests, Ms. McCracken will be required to execute a Non-Recourse Guaranty, Pledge Agreement, and such other documents as shall be necessary to effectuate the pledge of the New Equity Interests. The Plan Administrator shall take and maintain possession of the New Equity Interests. At such time as the Plan is Paid in Full the lien upon the new Equity Interests shall be immediately released and the lien extinguished.  The Plan Administrator shall take any and all necessary action to release the New Equity Interests to Ms. McCracken. The Debtor projects that the amount of New Value being contributed by Gretchen McCracken is approximately $1,300,000 in value.

       C.    <u>Impairment</u>:  Class 7 is Impaired and therefore the Holders of the Class 7 Interests are entitled to vote to accept or reject the Plan.

ARTICLE 5<br><u>MEANS OF IMPLEMENTATION OF THE PLAN</u>

5.1.  <u>Introduction</u>. This Article explains how the Debtor intends to effectuate the reorganization provided for hereunder and how the Debtor intends to fund the obligations to Creditors undertaken in this Plan. This Article also provides information with respect to the corporate governance of the Reorganized Debtor and other material issues bearing upon the performance of this Plan.

5.2.  <u>Funding</u>. This Plan will be funded from five (5) sources:  (1) Cash on hand on the Effective Date, (2) recoveries from the pursuit of any claims, rights, or other legal remedies the Debtor has, or may have in the future, (3) additional funding through A/R Funding, (4) tax refunds and/or tax credits which the Debtor is owed for any pre or post-petition period, including but not limited to the ERTC, and (5) available Cash from ongoing operations. The Debtor also reserves the right to utilize its M&T Bank line of credit (see, Class 4), to seek alternative financing (with approval of the Plan Administrator as described in Article 5.4 of the Plan), and to use funds from other sources not contemplated herein to fund this Plan, and/or vary

the proportions of funds from these or such other sources, provided the intent and purposes of this Plan are adequately addressed. In addition, the New Value contribution by Gretchen McCracken will further supplement and support the Plan funding.

    5.2.1.  <u>Beginning Cash Balance</u>.  This Plan anticipates funding certain Allowed Claims using Cash of the Debtor existing as of the Effective Date.  As of the Effective Date, the Reorganized Debtor is projected to have approximately $2,442,153.00 of Cash on Hand.

    5.2.2.  <u>Causes of Action</u>.  In accordance with § 1123(b)(3), and except as otherwise provided in this Plan, the Reorganized Debtor shall retain all Causes of Action, including, but not limited to, Avoidance Actions, and on the Effective Date which shall become assets of the Reorganized Debtor.  On and after the Effective Date, the Reorganized Debtor shall have the exclusive right to enforce any and all Claims and Causes of Action retained by the Reorganized Debtor against any Person.  The Reorganized Debtor may prosecute, defend, enforce, abandon, settle or release any or all Claims and Causes of Action as it deems appropriate without the need to obtain approval or any other or further relief from the Bankruptcy Court.  The Reorganized Debtor may, in its sole discretion, offset any such Claim held against a Person, against any payment due such Person under this Plan; *provided*, *however*, that any Claims of the Debtor arising before the Petition Date shall first be offset against Claims against the Debtor arising before the Petition Date.  All defenses and rights of avoidance of the Debtor shall be retained and may be exercised by the Reorganized Debtor.

    5.2.3.  <u>Tax Refunds and/or Tax Credits</u>.  The Debtor learned post-petition that it could be eligible for approximately $4.5 million in federal tax credit refunds on account of the Employee Retention Tax Credit ("ERTC").  The Debtor finalized its ERTC application in November 2023 with the assistance of its tax professionals at Frost Law. Specifically, the Debtor meets the requirements to qualify as an "eligible employer" pursuant to CARES Act section 2301(c)(2), as amended, and Code section 3134(c)(2) for certain calendar quarters in 2020 and 2021 and, therefore, is permitted to claim the Employee Retention Tax Credit. The Debtor anticipates in its Projections that the ERTC refunds will be issued in the 4th quarter of 2024 and will be captured in the proposed schedule for distribution under the Plan.[22]  In the event the Plan results in income tax consequence to the equity members of the Debtor, the Reorganized Debtor

---

[22]    On September 14, 2023, the Internal Revenue Service ("IRS") released Employee Retention Credit guidance placing a moratorium on processing new ERTC claims due to a surge in questionable claim submissions. Claims already submitted will continue to be processed, but at a slower rate due to detailed compliance reviews.

may make a distribution to equity members to address the tax ramifications of the ERTC as the Debtor is a pass-through disregarded entity that does not pay federal or state income taxes.

5.2.4.  Continued Operations. This Plan contemplates funding, from the on-going continued operations of the Reorganized Debtor that will produce net-positive Cash receipts after considering regular Cash disbursements made in the normal course of business of the Reorganized Debtor, but before taking into account payments contemplated by this Plan. A projection of the revenues from continued operations is attached to the Disclosure Statement as Exhibit 2.

A.  Cash Receipts:  This Plan anticipates ongoing Cash Receipts from the continuing operations of the Debtor, as described *supra*.

B.  Cash Disbursements:  This Plan anticipates ongoing Cash Disbursements for operational expenses made in the regular course of business and predicted based on similar Cash disbursements in the past and those in Debtor's budget submitted in the Bankruptcy Case. The Plan anticipates Cash disbursements for the Debtor's operational expenses to be increased one and a half percent (1.5%) each year (cumulatively) in order to represent adjustments for inflation.

5.3.  Management.  Upon the Effective Date, the Reorganized Debtor shall be controlled and managed by the current management and Gretchen McCracken as the sole owner, consistent with the Reorganized Debtor's Business Documents.

5.4.  Plan Administrator.  Upon the Confirmation Date, the Plan Administrator shall be appointed by the Court. The Plan Administrator shall have the power and duty to take the following actions under the Plan: (1) taking possession of the certificates representing the New Equity Interests as security for the Debtor's obligations under this Plan ; (2) receiving and analyzing the Quarterly Distribution Reports from the Reorganized Debtor to confirm that the Reorganized Debtor is in compliance with the terms of the Plan; (3); taking any action that the Plan Administrator deems appropriate and necessary following the occurrence of an Event of Default (and expiration of any applicable Cure Right), including working with the Debtor to determine the cause of the Event of Default, and if the Event of Default is due to such events such as (a) timing of cash receipts, (b) temporary investments in new business activities, or (c) other reasonable business judgments, a Waiver may be granted by the Plan Administrator, in its reasonable business judgment; (4) approving the Reorganized Debtor's borrowings in excess of

$1,000,000 (except for financing through AR Funding or the Reorganized Debtor's line of credit with M&T Bank, which shall be done in the sole discretion of the Management Team) in his or her reasonable business judgment, which approval shall only be required if the Reorganized Debtor is not in compliance with the terms of the Plan and such approval shall not be unreasonably withheld; (5) approval of any tax distributions to the Holders of the New Equity Interests in his or her reasonable business judgment and such approval shall not be unreasonably withheld; (6) approval of any adjustments in the terms of compensation for the Management Team in excess of 10% per year in his or her reasonable business judgment, which approval shall only be required if the Reorganized Debtor is not in compliance with the terms of the Plan and such approval shall not be unreasonably withheld; (7) approval of any bonuses for the Management Team in his or her reasonable business judgment, which approval shall only be required if the Reorganized Debtor is not in compliance with the terms of the Plan and such approval shall not be unreasonably withheld; (8) approval of any transaction or sale of substantially all of the Reorganized Debtor's assets in his or her reasonable business judgment and such approval shall not be unreasonably withheld; (9) approval of an extension of the Plan Term by up to six (6) months in his or her reasonable business judgment and such approval shall not be unreasonably withheld; and (10) such other rights and remedies as may be available to the Plan Administrator as set forth in the Plan, in the Plan Supplement, or in the Confirmation Order.

If there is an uncured Event of Default, the Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The Reorganized Debtor shall pay the reasonable fees and expenses of such professionals upon the monthly submission of statements. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business of the Reorganized Debtor and shall not be subject to the approval of the Court. The Plan Administrator's terms of compensation shall be described in the Plan Supplement with such compensation being paid in the ordinary course of business of the Reorganized Debtor and shall not be subject to the approval of the Court.

5.5.    <u>Business Documents Amendments</u>. As part of the Plan, the Reorganized Debtor shall amend the current Business Documents to the extent required to be consistent with this Plan. After the Effective Date, the Reorganized Debtor may amend its Business Documents

in the ordinary course of its business so long as such amendments are not inconsistent with the terms of the Plan and such amendments cannot create any additional New Equity Interests.

      5.6.    Vesting of Property. Pursuant to § 1141(b), on the Effective Date title to all Property and rights of the Estate shall vest in the Reorganized Debtor and shall remain in the Estate to be distributed in accordance with the terms of the Plan, free and clear of all Claims, interests, Liens, security interests, charges, and other encumbrances (except as otherwise provided in this Plan). As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of its Property, and settle and compromise Claims without the supervision of, or any authorization from the Bankruptcy Court or the U.S. Trustee, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order. All privileges with respect to the Property of the Estate, including the attorney/client privilege, to which the Debtor is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtor.

      5.7.    Continued Organizational Existence. The Reorganized Debtor shall continue to exist as a limited liability company under the laws of the State of Delaware after the Effective Date, with all the powers of a limited liability company thereunder.

      5.8.    Corporate Action; Further Acts. On the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects by virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without requirement of further action by the Debtor or Reorganized Debtor. On the Effective Date, all matters provided for under this Plan involving the structure of the Debtor or the Reorganized Debtor, or any formal action to be taken by or required of the Debtor or the Reorganized Debtor in connection with this Plan, shall be deemed to have occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement for further action by the Debtor or the Reorganized Debtor. On the Effective Date, the Reorganized Debtor is authorized and directed pursuant to § 1142(b) to implement the provisions of this Plan and any other agreements, documents and instruments contemplated by or necessary for the consummation of this Plan in the name of and on behalf of the Reorganized Debtor.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1     <u>Each Impaired Class is Entitled to Vote Separately</u>. Except as otherwise provided in herein, the Holders of Claims in each Impaired Class of Claims shall be entitled to vote separately to accept or reject the Plan.

6.2     <u>Acceptance by an Impaired Class</u>. Consistent with § 1126(c) and except as provided for in § 1126(e), an Impaired Class of Claims shall have accepted this Plan if it is accepted by at least two-thirds in dollar amount and more than one-half in number of the Holders of Allowed Claims of such Class that have timely and properly voted on this Plan.

6.3     <u>Impairment Controversies</u>. If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, such Claim or Class of Claims shall be determined by the Bankruptcy Court at the hearing on confirmation of the Plan.

6.4     <u>Cram Down</u>. The Debtor may utilize the provisions of § 1129(b) to satisfy the requirements for confirmation of this Plan over the rejection, if any, of any Class entitled to vote on this Plan.

## ARTICLE 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     <u>Assumption of Certain Executory Contracts</u>. Each executory contract or unexpired lease that (i) has not been expressly assumed or rejected with approval by order of the Bankruptcy Court on or prior to the Confirmation Date, (ii) is not the subject of a motion to assume or reject pending as of the Confirmation Date, or (iii) that is not specifically designated as a contract or lease to be rejected and identified in a separate filing made twenty (20) days prior to any hearing on the Confirmation of the Plan, will, as of the Confirmation Date, and subject to this section, be deemed to have been assumed by the Debtor.

Notwithstanding anything otherwise to the contrary, the Debtor reserves the right, prior to the Confirmation Date, to reject any executory contract or unexpired lease.

Each executory contract and unexpired lease assumed pursuant to this section of the Plan (except for those that are assumed and assigned) shall vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, or any order of the Bankruptcy Court authorizing or providing for its assumption or applicable federal law.

7.2     Approval of Assumption of Executory Contracts. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval pursuant to §§ 365 and 1123, of the assumption of each contract assumed pursuant to this Plan.

7.3     Cure of Defaults on Assumed Contracts and Leases:  Any monetary defaults existing under each Executory Contract or Unexpired Lease to be assumed under the Plan will be cured pursuant to the Claim treatment of Classes 2, 3, 5, 6, and 7 as set forth herein. Except as otherwise provided in the Confirmation Order (or other order of the Bankruptcy Court), adequate assurance of future performance shall be the promise of the Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under this Plan, the Debtor's demonstrated performance to date post-petition, and the anticipated ERTC (defined below).

The parties to such executory contracts and unexpired leases to be assumed by the Debtor shall have the right to object to the cure amounts listed by the Debtor under Classes 2, 3, 5, 6, and 7. A party to an executory contract or unexpired lease to be assumed by the Debtor that does not file an objection with the Bankruptcy Court  to the cure amounts identified in this Plan shall be deemed to have waived its right to dispute such amount. If there are any objections filed, the Bankruptcy Court shall hold a hearing. In the event the Bankruptcy Court determines that the cure amount is greater than the cure amount listed by the Debtor, the Reorganized Debtor may elect to reject the executory contract or unexpired lease and not pay such greater cure amount. All cure amounts to be paid pursuant to this section will be paid by the Reorganized Debtor pursuant to the Classes specified above.

7.4     Insurance Policies. All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts that will be assumed under the Plan.

7.5     Rejection of Certain Executory Contracts. The Debtor does not currently contemplate the rejection of any Executory Contracts. Notwithstanding the foregoing, the Debtor reserves the right, in its sole discretion, to reject any Executory Contracts or Unexpired Leases.

7.6     Bar Date for Rejection Damages. With respect to any executory contract or unexpired lease rejected by the Debtor, the rejection will be deemed to constitute a breach of such contract or lease immediately prior to the Petition Date and may result in a pre-Petition Date Claim against the Debtor for damages. Unless otherwise provided by an order of the

Bankruptcy Court entered prior to the Confirmation Date, a Proof of Claim with respect to any Claim against the Debtor arising from the rejection of any executory contract or unexpired lease pursuant to an order of the Bankruptcy Court (including the Confirmation Order) must be filed with the Bankruptcy Court by the later of (a) the Bar Date, or (b) fourteen (14) days from the date of entry of such order of the Bankruptcy Court approving such rejection. Any Entity that fails to file a Proof of Claim with respect to its Claim arising from such a rejection within the period set forth above will be forever barred from asserting a Claim against the Debtor, the Reorganized Debtor or any of its Affiliates or Subsidiaries or its respective property or interests in property.

      7.7    <u>Indemnification Rights</u>. All Claims for Indemnification Rights against the Debtor not specifically assumed by the Debtor, in the Debtor's sole discretion, will be deemed rejected as of the Effective Date unless such Claims are otherwise Allowed Claims or arise after the Confirmation Date in accordance with the Business Documents.

ARTICLE 8
PROVISIONS GOVERNING DISTRIBUTIONS

      8.1    <u>Allocation of Distributions</u>. Except as otherwise specifically provided hereinabove, Distributions to any Holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim, and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest or other charges (but solely to the extent that such interest or other charges are an allowable portion of such Allowed Claim). For the avoidance of doubt, the foregoing shall not be interpreted to expand on the payment obligations and/or treatment provisions of any Claims in Article 4 or to provide for the payment of interest to any Claims except as expressly provided for in Article 4. All payments shall be made in accordance with the priorities established by the Bankruptcy Code.

      8.2    <u>Delivery of Distributions and Undeliverable Distributions</u>. Distributions to Holders of Allowed Claims shall be made at the address of each such Holder as set forth on the Schedules filed with the Bankruptcy Court unless superseded by the address as set forth on the Proofs of Claim filed by such Holders or other writing notifying the Reorganized Debtor of a change of address. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until the Reorganized Debtor is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such

Holder, without interest from the date of the first attempted Distribution. All Claims for undeliverable Distributions shall be made on or before sixty (60) days after the date such undeliverable Distribution was initially made. After such date, all unclaimed property shall, in the discretion of the Reorganized Debtor, be used to satisfy the costs of administering and fully consummating the Plan, to the extent such costs would otherwise be paid from available Cash, or become available Cash for distribution in accordance with the Plan, and the Holder of any such Claim shall not be entitled to such undeliverable Distribution or any other or further Distribution under the Plan on account of such Claim.

8.3    Time Bar for Check Payments. Checks issued by the Reorganized Debtor for Allowed Claims shall be null and void if not finally negotiated or otherwise presented for payment within sixty (60) days after the date of issuance thereof. The Holder of the Allowed Claim to whom a check originally was issued shall make any request for reissuance of a check so voided to the Reorganized Debtor. Any such request for reissuance shall be made on or before thirty (30) days after the expiration of the sixty (60) day period following the date of issuance of such original check. The Debtor shall have thirty (30) days to reissue such check, after which the Holder shall have twenty (20) days to present the same for final payment. The Debtor expressly reserves the right, at any time after the original check is declared null and void, to combine such original check with any subsequent payment then due to the same Holder into a single check. After such one hundred fortieth (140th) date following original issuance of such check, all funds held on account of both such voided checks shall, in the discretion of the Reorganized Debtor, be used to satisfy the costs of administering and fully consummating this Plan, to the extent such costs would otherwise be paid from available Cash, or become available Cash for Distribution in accordance with this Plan, and the Holder of any such Claims shall not be entitled to such voided check or any other or further Distribution under this Plan on account of such Claim.

8.4    Setoffs. The Reorganized Debtor may, in accordance with § 553 and applicable non-bankruptcy law, setoff against any Allowed Claim and the Distributions to be made pursuant to this Plan on account of such Claim (before any Distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Reorganized Debtor may hold, whether currently existing or hereafter arising, against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such

claims, rights and causes of action that the Reorganized Debtor may possess against such Holder. The Reorganized Debtor shall have the exclusive right and authority to settle claims and recognize setoff rights.

ARTICLE 9
PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

9.1     No Distribution Pending Allowance. Notwithstanding any other provision of this Plan, no payments shall be distributed to a Holder of a Claim under this Plan on account of any Disputed Claim unless and until such Claim becomes an Allowed Claim.

9.2     Resolution of Disputed Claims. Notwithstanding any other provision of the Plan to the contrary, after the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Reorganized Debtor shall have the exclusive right (except as to applications for allowances of compensation and reimbursement of expenses under §§ 330 and 503, and except as to any objections which have been filed prior to the Confirmation Date by any party) to make and file objections to Claims and shall serve a copy of each objection upon the Holder of the Claim to which the objection is made as soon as practicable, but in no event later than sixty (60) days after the Effective Date. From and after the Effective Date, all objections shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any such objection or the Reorganized Debtor and the Holder elect to compromise, settle or otherwise resolve any such objection, in which event they may settle, compromise or otherwise resolve any Disputed Claim.

9.3     Estimation. The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) regardless of whether the Reorganized Debtor has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, the estimated amount may constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claim objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which have

been estimated subsequently may be compromised, settled, withdrawn, or otherwise resolved as provided in this Plan.

9.4     Reserve Accounts for Disputed Claims. The Reorganized Debtor shall hold in the Disputed Claims Reserve, funds in an aggregate amount sufficient to pay to each Holder of a Disputed Claim until it becomes an Allowed Claim, the amount that such Holder would have been entitled to receive under this Plan if such Claim had been an Allowed Claim on the Effective Date (the "Dispute Claims Reserve"). The Disputed Claims Reserve, as determined by the Reorganized Debtor, will be used to satisfy such Claims if and when such Disputed Claims become Allowed Claims.

9.5     Investment of Disputed Claims Reserve. The Reorganized Debtor shall be permitted, from time to time, in its sole discretion, to invest all or a portion of the funds in the Disputed Claims Reserve in interest-bearing savings accounts, United States Treasury Bills, interest-bearing certificates of deposit, tax-exempt securities or investments permitted by § 345 or otherwise authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such funds without inordinate credit risk or interest rate risk. All interest earned on such funds shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of the Disputed Claims Reserve and, in the discretion of the Reorganized Debtor, be used to satisfy the costs of administering and fully consummating this Plan or become available Cash for distribution in accordance with this Plan.

9.6     Release of Funds from Disputed Claims Reserve. If at any time or from time to time after the Effective Date, there shall be funds in the Disputed Claims Reserve in an amount in excess of the Reorganized Debtor's maximum remaining payment obligations to the Holders of then-existing Disputed Claims under this Plan, such excess funds shall become available to the Reorganized Debtor generally and shall, in the discretion of the Reorganized Debtor be used to satisfy the costs of administering and fully consummating this Plan or become available Cash for distribution in accordance with this Plan.

9.7     Distributions After Allowance of Disputed General Unsecured Claims. Distributions to each Holder of a Disputed General Unsecured Claim, to the extent that such General Unsecured Claim ultimately becomes an Allowed General Unsecured Claim, will be

made in accordance with the provisions of this Plan, including the provision governing the applicable Class of General Unsecured Claims. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed General Unsecured Claim becomes a Final Order, the Reorganized Debtor will begin distributions to the Holder of such Allowed General Unsecured Claim its General Unsecured Payment Amount.

       9.8    <u>Instruments</u>.

       9.8.1    <u>Rights of Persons Holding Instruments</u>. Except as otherwise provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all instruments evidencing or relating to any Claim, other than for an Allowed Class 1 Claim, shall be deemed automatically cancelled and deemed void and of no further force or effect, without any further action on the part of any Person, and any Claims evidenced by or relating to such instruments shall be deemed discharged.

       9.8.2    <u>Cancellation of Liens</u>. Except as otherwise provided herein, as of the Effective Date, any Lien securing an Allowed Secured Claim, other than as treated and Allowed in Class 1, shall be deemed released and discharged, and the Holder of each such Allowed Secured Claim, other than as treated as an Allowed Secured Claim in Class 1, shall be authorized and directed to release any Collateral or other Property of the Debtor (including, without limitation, any cash collateral) held by such Holder and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence release of such Lien, including without limitation, by the execution, delivery, and filing or recording of such releases as may be requested by the Reorganized Debtor.

ARTICLE 10
DISCHARGE, EXCULPATION FROM
<u>LIABILITY, RELEASE, AND GENERAL INJUNCTION</u>

       10.1    <u>Discharge of Claims</u>.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to § 1141(d), to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor, the Reorganized Debtor, and the Estate, and any of their respective successors and assigns, and the assets and Property of any of them, from any and all Debts, Liabilities or Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided herein or in the Confirmation Order, but

- 39 -

without limiting the generality of the foregoing, on the Effective Date under its Business Documents, the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in §§ 502(g), 502(h), or 502(i), whether or not (a) a Proof of Claim based on such Debt was filed pursuant to § 501, (b) a Claim based on such Debt is an Allowed Claim pursuant to § 502, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. Except for the rights provided for under the confirmed Plan, as of the Effective Date all Persons, including all Holders of Claims and Interests, shall be forever precluded and permanently enjoined from asserting directly or indirectly against any of the Debtor, the Reorganized Debtor, and the Estate, and any of their respective successors and assigns, and the assets and Property of any of them, any other or further Claims, rights of arbitration, Debts, rights, causes of action, remedies, Liabilities or interests based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date, and the Confirmation Order shall contain appropriate injunctive language to that effect. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts, rights of arbitration, and Liabilities against the Debtor, pursuant to §§ 524 and 1141, to the fullest extent permitted by applicable law, and such discharge shall void any judgment or arbitration award obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, Debt, arbitration award or Interest. Notwithstanding the foregoing, the Reorganized Debtor shall remain obligated to make payments and Distributions to Holders of Allowed Claims as required pursuant to the Plan and shall govern its post-performance affairs in accordance with the Business Documents (as amended).

10.2    Release and Exculpations Relating to the Chapter 11 Case.  Neither the Reorganized Debtor, the Committee, or any of their respective Affiliates, directors, officers, employees, members (to the extent that they support and vote in favor of this Plan), attorneys, attorneys of the members, consultants, advisors and agents (acting in such capacity) (collectively, the "Exculpated Parties"), shall have or incur any liability to any Person or Entity for any act taken or omitted to be taken in connection with or arising out of the commencement

of the Chapter 11 Case, the formulation, preparation, dissemination, implementation, confirmation or approval of this Plan, any other plan of reorganization or any compromises or settlements contained herein, any disclosure statement related thereto or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the transactions set forth in the Plan or in connection with any other proposed plan (provided, however, that the foregoing provisions shall not affect the liability that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct) unless such person obtains the prior approval of the Bankruptcy Court to bring such a claim.  Each of the foregoing parties in all respects shall have been and shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities during the Chapter 11 Case and under this Plan.  The rights granted under this paragraph are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties may have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law.  Nothing in this Section or elsewhere in this Plan shall release, discharge, or exculpate any non-Debtor party from (a) any claim owed to the United States government or its agencies, including any liability arising under the Internal Revenue Code or criminal laws of the United States, or (b) any claim of any Claimant except as expressly set forth herein.  Unless otherwise preserved, upon Confirmation of the Plan, the Debtor, and Gretchen McCracken due to her contribution to the Reorganized Debtor as described in the Plan, shall be released from any Claims that any Creditor could or may have asserted in this case.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.

      10.3   <u>General Injunction</u>.  Pursuant to §§ 105, 524, 1123, 1129 and 1141, in order to preserve and implement the various transactions contemplated by and provided for herein, as of the Confirmation Date, except as otherwise expressly provided herein or in the Confirmation Order, all Persons that have held, currently hold or may hold a Claim, Debt, Lien, Judgment, Arbitration Award or Liability that is discharged or terminated pursuant to the terms of this Plan are and shall be permanently enjoined and forever barred from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liens, judgments, arbitration award or Liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents:

(a)    commencing or continuing in any manner, directly or indirectly, any action or other proceeding (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them;

(b)    enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, arbitration award or order against the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them;

(c)    creating, perfecting, or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them;

(d)    asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them;

(e)    commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or

(f)    interfering with or in any manner whatsoever disturbing the rights and remedies the Debtor, the Reorganized Debtor, the Estate, and any of their respective successors and assigns, and the assets and Property of any of them, under the Plan and the Plan Documents and the other documents executed in connection therewith.

The Debtor and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation.

10.4    Term of Certain Injunctions and Automatic Stay.

10.4.1  All injunctions or automatic stays for the benefit of the Debtor pursuant to §§ 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Case or Order of the Court, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date, unless otherwise ordered by the Bankruptcy Court.

10.4.2  With respect to lawsuits, if any, pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtor's liability on Prepetition Claims asserted therein and that are stayed pursuant to § 362, such lawsuits shall be

- 42 -

deemed dismissed as of the Effective Date, unless the Reorganized Debtor affirmatively elects to have such liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Reorganized Debtor affirmatively elects to have the automatic stay lifted and to have such liability established by such other courts; and the Prepetition Claims at issue in such lawsuits, if any, shall be determined and either allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Reorganized Debtor as provided herein.

The only lawsuit the Reorganized Debtor affirmatively elects to continue post-confirmation is the appeal before the Court of Appeals of Virginia, *Golden Key Group, LLC v. Communication Technologies, Inc.,* Record No. 1594-22-4.

10.5    <u>Default</u>. The Reorganized Debtor's failure to make any Monthly Plan Payment, the Semi-Annual Plan Payment, or Quarterly Excess Cash Payment (as when required) to Creditors  when due under the Plan as set forth in the Projections or the failure of the Reorganized Debtor to fully pay all Allowed Claims in full by the end of the Plan Term (as the same may have been extended by the Plan Administrator) shall each constitute an event of default ("Event of Default").  The Plan Administrator, the U.S. Trustee, and any Holder of an Allowed Claim shall have the right to serve a written notice of a default (a "Notice of Default") upon the Reorganized Debtor.  The Reorganized Debtor shall have thirty (30) days after the date of filing of the Notice of Default (the "Cure Period") within which to cure such Event of Default ("Cure Right").  The Debtor is entitled to four (4) Cure Rights in each rolling twelve-month period. Upon the occurrence of a fifth (5th) or any subsequent Event of Default within that twelve-month period, the Reorganized Debtor shall have no further Cure Rights.

If an Event of Default is not cured, then  the Plan Administrator may file a motion to reopen the bankruptcy case (if it is closed)[23] and file a Notice of Default with the Court, the Reorganized Debtor shall file a response to such Notice of Default (the "Default Challenge") within five (5) business days after the conclusion of the Cure Period which shall state (1) whether the Event of Default has been cured or (2) if the Reorganized Debtor disputes the Event of Default and the basis for such dispute.  The Plan Administrator, the United States Trustee, and

---

[23]    The Reorganized Debtor shall pay any filing fee for the reopening of the bankruptcy case by the Plan Administrator.

the Holder of any Allowed Claim shall have ten (10) business days after the filing of the Default Challenge to file a pleading with the Bankruptcy Court in reply to the Default Challenge ("Default Challenge Response").

If there is an uncured Event of Default, the Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The Reorganized Debtor shall pay the reasonable fees and expenses of such professionals upon the monthly submission of statements. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business of the Reorganized Debtor and shall not be subject to the approval of the Court.

Notwithstanding anything to the contrary in this Plan, the Plan Administrator shall have the exclusive right, in his or her reasonable business judgment, to grant a waiver of any uncured Event of Default (a "Waiver") by serving a written notice (a "Notice of Waiver") by U.S. Mail and email on the Reorganized Debtor and the U.S. Trustee, and by U.S. Mail on any Holder of an Allowed Claim within ten (10) business days after the service of the Default Challenge.

In the event that the Plan Administrator files a Notice of Waiver, the U.S. Trustee and any Holder of an Allowed Claim shall have ten (10) business days from the date of service of the Notice of Waiver to reopen the bankruptcy case (if it is closed) and to object to such Notice of Waiver ("Waiver Challenge"). The Waiver shall become immediately effective upon the Plan Administrator's filing of a Notice of Waiver, notwithstanding that a Waiver Challenge is filed. If no Waiver Challenge is filed, then the Waiver is effective and shall not be subject to further review or challenge.

The Bankruptcy Court shall conduct a hearing to adjudicate any (1) Default Challenge Response, (2) Waiver Challenge, and/or (3) any relief sought by the Debtor.

All pleadings filed pursuant to this Article 10.5 shall be served on the Reorganized Debtor and the United States Trustee in accordance with Article 13.10, and on the Plan Administrator.

Upon (1) expiration of the Plan Administrator's time to file a Notice of Waiver without any such notice being filed, (2) a determination by the Bankruptcy Court that there is an

uncured Event of Default, provided such uncured Event of Default is disputed by the
Reorganized Debtor, (3) the termination by the Bankruptcy Court of any Waiver granted by the
Plan Administrator, if such Waiver was granted, or (4) denial of any relief sought by the Debtor,
then:

       (a)     The United States Trustee or the  Plan Administrator may file a
motion with the Bankruptcy Court seeking such relief as the movant deems appropriate
including, but not limited to, removal of the debtor in possession and/or conversion to chapter 7
to permit a trustee to liquidate the Debtor's assets, or to enforce its rights under the Plan; and

       (b)     The Plan Administrator shall have the right to assert all rights and
remedies of a secured party under the Uniform Commercial Code or other applicable law,
including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver,
grant options to purchase or otherwise retain, liquidate, or dispose of all or any portion of the
New Equity Interests, which such action, sale, or disposition shall be done with Court approval
subject to Section 363 of the Bankruptcy Code and any other applicable provisions.

       10.6    <u>Remedies are Cumulative</u>. All remedies hereunder are cumulative and not
exclusive, may be exercised concurrently and nothing herein shall be deemed to prohibit or limit
any party from pursuing any other remedy or relief available at law or in equity for any actual or
prospective breach or default, including recovery of damages.

       10.7    <u>Liability for Tax Claims</u>. Unless a taxing Governmental Unit has asserted
a Claim against the Debtor before the Bar Date established therefore, no Claim of such
Governmental Unit shall be allowed against the Debtor, the Reorganized Debtor or their
respective members, managers or other officers, employees or agents for taxes, penalties,
interest, additions to Tax or other charges arising out of (i) the failure, if any, of the Debtor, any
of its Affiliates, or any other Person or Entity to have paid Tax or to have filed any tax return
(including any income tax return or franchise tax return) in or for any prior year or period, or
(ii) an audit of any return for a period before the Petition Date.

ARTICLE 11
<u>RETENTION OF JURISDICTION</u>

       11.1    <u>Jurisdiction of the Bankruptcy Court</u>. Unless otherwise provided by a prior
Order in the Bankruptcy Case, the Bankruptcy Court shall retain exclusive jurisdiction of all
matters arising under, arising out of, or related to, the Bankruptcy Case and this Plan pursuant to,
and for the purposes of §§ 105(a) and 1142 and for, among other things, the following purposes

- 45 -

until such time as the Debtor's and Reorganized Debtor's obligations, respectively, under the Plan are fully discharged:

(a)     To hear and determine any motions for the assumption or rejection of any executory contracts or unexpired leases, and the allowance of any Claims resulting therefrom;

(b)     To determine any and all pending adversary proceedings, applications and contested matters;

(c)     To hear and determine any objection to any Claims;

(d)     To determine any and all objections to cure amounts required pursuant to Article 7 of the Plan;

(e)     To liquidate or estimate damages or determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim;

(f)     To adjudicate all Claims to any lien on any of the Debtor's assets or any proceeds thereof;

(g)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated, and/or if the Effective Date never occurs;

(h)     To issue such orders in aid of execution of this Plan to the extent authorized by § 1142;

(i)     To consider any modifications of this Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(j)     To hear and determine all applications for compensation and reimbursement of expenses of Professionals under §§ 330, 331 and 503(b);

(k)     To enforce and interpret the Plan and to hear and determine any dispute or any other matter arising out of or related to this Plan;

(l)     To recover all assets of the Debtor and Property of the Estate, wherever located;

(m)    To hear and determine matters concerning state, local and federal taxes in accordance with §§ 346, 505, and 1146;

(n)     To enforce and interpret the discharge of Claims effected by this Plan and to enter and implement such orders as may be appropriate with regard thereto;

(o)     To hear and decide all disputes concerning any Notice of Default, Wavier Challenge, or Default Challenge, or any other disputes regarding an Event of Default;

(p) To order any necessary or appropriate relief following an Event of Default by the Reorganized Debtor, including, but not limited to, ordering the sale of the Reorganized Debtor or the New Equity Interests pursuant to Section 363 of the Bankruptcy Code;

(q) To hear any other matter consistent with the provisions of the Bankruptcy Code;

(r) To hear and determine such other issues as the Court deems necessary and reasonable to carry out the intent and purposes of this Plan, including any defaults in the performance of the Plan and any Plan modifications allowable under applicable law; and

(s) To enter a final decree closing the Bankruptcy Case.

ARTICLE 12
TAX CONSEQUENCES OF THE PLAN

12.1    No Tax on Transfers. Pursuant to § 1146(a):  (i) the issuance, distribution, transfer or exchange of interests or other Property; (ii) the creation, modification, consolidation or recording of any deed of trust or other security interest, the securing of additional indebtedness by such means or by other means in furtherance of or in connection with the Plan, the Confirmation Order, and any related documents; (iii) the making, assignment, modification or recording of any lease or sublease; (iv) the sale or transfer of assets shall be deemed exempt from all taxes arising from such sale or transfer which would otherwise be imposed at the time of transfer or sale, which are determined by consideration for or value of the Property being transferred, or as a percentage thereof, including taxes imposed by the State of Maryland or other applicable law, or (v) the making, delivery or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, the Confirmation Order, any related documents or any transaction contemplated above or any transactions arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act or real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall be, and hereby are, directed to forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

12.2    <u>Tax Consequences to Holders of Claims</u>. The implementation of this Plan may have federal, state, and local tax consequences to the Holders of Claims. No tax opinion has been sought nor will be obtained with respect to any tax consequences of this Plan. HOLDERS OF CLAIMS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THIS PLAN.

12.3    <u>Tax Consequences to Holders of Allowed Interests</u>. The implementation of this Plan may have federal, state, and local tax consequences to the Holders of Allowed Interests. HOLDERS OF INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THIS PLAN.

## ARTICLE 13
## <u>MISCELLANEOUS PROVISIONS</u>

13.1    <u>Professional Fees and Expenses</u>. As of the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of the Professionals employed by the Debtor in connection with the implementation and consummation of this Plan, the claims reconciliation process and any other matters as to which such Professionals may be engaged.

13.2    <u>Dissolution of the Committee</u>. On the Effective Date, the Committee shall cease to exist and their members and employees or agents (including attorneys and other professionals) shall be released from all further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Case and no subsequent fees will accrue to the Committee, other than in connection with any application for final allowance of compensation and reimbursement of expenses in accordance with Article 2 of this Plan.

13.3    <u>Waiver of Certain Fees</u>. Unless otherwise provided in this Plan, all claims for penalties, default interest and/or late fees that may have accrued on Claims are extinguished.

13.4    <u>U.S. Trustee Fees</u>. The Debtor is, and shall remain, current in paying all fees owed to the U.S. Trustee until the Bankruptcy Case is closed.

13.5    <u>Payment of Statutory Fees</u>. All fees payable pursuant to Chapter 123 of Title 28, United States Code, as determined by the Bankruptcy Court on the Confirmation Date, shall be paid by the Reorganized Debtor.

13.6    Modification of Plan. The Debtor reserves the exclusive right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan and to solicit acceptances of any amendments or modifications hereto, at any time prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Reorganized Debtor may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with § 1127(b), or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan. A Holder of an Allowed Claim that is deemed to have accepted this Plan shall be deemed to have accepted this Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

13.7    Withdrawal or Revocation. The Debtor may amend, withdraw, or revoke this Plan at any time prior to the Confirmation Date. If the Debtor withdraws or revokes this Plan prior to the Confirmation Date or if the Confirmation Date does not occur for any reason, then this Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

13.8    Successors and Assigns. The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor or assign of such entity.

13.9    Courts of Competent Jurisdiction. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

13.10    Notices . Any notices to, or requests   by a Party in Interest under or in connection with this Plan shall be in writing by electronic mail and served either by (i) regular first-class mail, return receipt requested, postage prepaid, (ii) hand delivery or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtor:

        Golden Key Group, LLC
        Attn:  Gretchen McCracken, CEO
        1850 Centennial Park Drive, Suite 200
        Reston, Virginia 20191
        gmccracken@goldenkeygroup.com

        Golden Key Group, LLC
        Attn:  Phil Moravec, COO
        1850 Centennial Park Drive, Suite 200
        Reston, Virginia 20191
        pmoravec@goldenkeygroup.com

        and

        Golden Key Group, LLC
        Attn:  Anthony Wilson, General Counsel
        1850 Centennial Park Drive, Suite 200
        Reston, Virginia 20191
        awilson@goldenkeygroup.com;

with a copy to:

        Paul Sweeney, Esquire
        YVS Law, LLC
        11825 West Market Place, Suite 200
        Fulton, Maryland  20759
        psweeney@yvslaw.com

To the United States Trustee:

        Office of the U.S. Trustee
        Attn: Lynn A. Kohen, Esquire
        6305 Ivy Lane, Suite 600
        Greenbelt, Maryland  20770
        lynn.a.kohen@usdoj.gov.

13.11    11 U.S.C. § 1125(e).

      (a)    The Debtor (and each of its respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon confirmation of this Plan will be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

      (b)    The Debtor, each of the members of the Committee (and each of their respective Affiliates, agents, directors, officers, principals, members, employees, representatives, advisors, attorneys and other professionals) have, and upon confirmation of this Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule,

or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

13.12   Severability.  In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of this Plan is invalid, void or unenforceable, the Bankruptcy Court, with the consent of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.13   Governing Law. Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the United States of America and, when applicable, the State of Maryland, without giving effect to the principles of conflicts of law thereof.

13.14   Headings. Headings are used in this Plan for convenience and reference only and shall not constitute a part of this Plan for any other purpose.

GOLDEN KEY GROUP, LLC

Dated:_____February 26, 2024_____        By:_____
                                              Gretchen McCracken, CEO

Counsel for Debtor:


_____/s/ Paul Sweeney_____
Paul Sweeney, 07072
Corinne Donohue Adams, 18768
YVS Law, LLC
11825 West Market Place, Suite 200
Fulton, Maryland  20759
(443) 569-5972
psweeney@yvslaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of February 2024, notice of filing the Debtor's Second Amended 100% Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code dated February 26, 2024 (the "Plan") was served by CM/ECF to those parties listed on the docket as being entitled to such electronic notices, which parties are identified on the attached service list; and a copy of the Plan was sent by electronic mail to the parties so identified on the attached service list.

    /s/ Paul Sweeney
Paul Sweeney

**The following parties received
a copy of the filing by e-mail:**

Lynn A. Kohen, Esquire
(lynn.a.kohen@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

Patricia B. Jefferson, Esquire
(pjefferson@milesstockbridge.com)
Counsel for AR Funding
Miles & Stockbridge P.C.
10 Light Street, 10th Floor
Baltimore, Maryland  21202

Kevin C. Gilbert, Executive Vice President
Credit Administration
(kgilbert@arfunding.com)
Associated Receivables Funding, Inc.
126 Millport Circle
Greenville, South Carolina  29607

Gordon W. Farr, Executive Vice President
Business Development
(gfarr@arfunding.com)
Associated Receivables Funding, Inc.
126 Millport Circle
Greenville, South Carolina  29607

Jeffrey S. Cianciulli, Esquire
(jcianciulli@wgpllp.com)
Counsel for Libertas Funding
Weir Greenblatt Pierce LLP
1339 Chestnut Street, Suite 500
Philadelphia, Pennsylvania  19107

Randy Saluck, Chief Executive Officer
(randy.saluck@libertasfunding.com)
Libertas Funding LLC
411 West Putnam Avenue, Suite 220
Greenwich, Connecticut  06830

Jessica Patrovic
(jessica.patrovic@libertasfunding.com)
Libertas Funding LLC
411 West Putnam Avenue, Suite 220
Greenwich, Connecticut  06830

Samuel C. Wisotzkey, Esquire
(swisotzkey@kmksc.com)
Counsel for Manpower Group
Kohner, Mann & Kailas, S.C.
4650 North Port Washington Road
Milwaukee, Wisconsin  53212

Stephen K. Gallagher, Esquire
(skgallagher@venable.com)
Counsel for Peraton Inc.
Venable LLP
1850 Towers Crescent Plaza, Suite 400
Tysons, Virginia  22182

Janet M. Nesse, Esquire
(jnesse@mhlawyers.com)
Counsel for Lindholm & Associates
McNamee Hosea Jernigan Kim Greenan
& Lynch, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  20770

Megan Rose
Lindholm & Associates, Inc.
1225 Hollidge Road
Lusby, Maryland  20657
meganrose@lindholm-associates.com

Jeffrey M. Orenstein, Esquire
(jorenstein@wolawgroup.com)
Counsel for Communication Technologies
Wolff, & Orenstein, LLC
15245 Shady Grove Road
North Lobby, Suite 465
Rockville, Maryland 20850

Kevin M. O'Donnell, Esquire
(kmo@henrylaw.com)
Counsel for Strategic Consulting Team
Henry & O'Donnell, P.C.
300 North Washington Street, Suite 204
Alexandria, Virginia  22314

Justin P. Fasano, Esquire
(jfasano@mhlawyers.com)
Counsel for Lindholm & Associates
McNamee Hosea Jernigan Kim Greenan
& Lynch, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  20770

Brent C. Strickland, Esquire
(bstrickland@wtplaw.com)
Counsel for Creditors' Committee
Whiteford, Taylor & Preston L.L.P.
111 Rockville Pike, Suite 800
Rockville, Maryland  20850

Christopher A. Jones, Esquire
(cajones@wtplaw.com)
Counsel for Creditors' Committee
Whiteford, Taylor & Preston L.L.P.
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia  22042

Ed Gezel, Agent
(notices@bkservicing.com)
BK Servicing, LLC (Daimler Trust)
P. O. Box 131265
Roseville, Minnesota  55113-0011

John Gordon, President
(jgordon@polingerco.com)
Polinger Development Company
5530 Wisconsin Avenue, Suite 1000
Chevy Chase, Maryland  20815

John C. Decker II, Esquire
(the.decks@verizon.net)
Counsel for SDL Consulting, Inc.
5207 Dalby Lane
Burke, Virginia 22015

**The following parties received
CM/ECF notice of the filing:**

Corinne Donohue Adams, Esquire
(psweeney@yvslaw.com)
Counsel for Debtor
YVS Law, LLC
11825 West Market Place, Suite 200
Fulton, Maryland 20759

J. Zachary Balasko, Esquire
(john.z.balasko@usdoj.gov)
U.S. Department of Justice, Civil Division
P. O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

John C. Decker II, Esquire
(the.decks@verizon.net)
Counsel for SDL Consulting, Inc.
5207 Dalby Lane
Burke, Virginia 22015

Emily Devan, Esquire
(edevan@milesstockbridge.com)
Counsel for AR Funding
Miles & Stockbridge P.C.
100 Light Street
Baltimore, Maryland  21202

Nicole C. Kenworthy, Esquire
(bdept@mrrlaw.net)
Counsel for Prince George's County
Meyers, Rodbell & Rosenbaum, P.A.
6801 Kenilworth Avenue, Suite 400
Riverdale, Maryland  20737-1385

David S. Musgrave, Esquire
(dmusgrave@gfrlaw.com)
Counsel for FMP Consulting
Gordon Feinblatt LLC
1001 Fleet Street, Suite 700
Baltimore, Maryland  21202

Brent C. Strickland, Esquire
(bstrickland@wtplaw.com)
Counsel for Creditors' Committee
Whiteford, Taylor & Preston L.L.P.
111 Rockville Pike, Suite 800
Rockville, Maryland  20850

Samuel C. Wisotzkey, Esquire
(swisotzkey@kmksc.com)
Counsel for Manpower Group
Kohner, Mann & Kailas, S.C.
4650 North Port Washington Road
Milwaukee, Wisconsin  53212

Stephen K. Gallagher, Esquire
(skgallagher@venable.com)
Counsel for Peraton Inc.
Venable LLP
1850 Towers Crescent Plaza, Suite 400
Tysons, Virginia  22182

Lynn A. Kohen, Esquire
(lynn.a.kohen@usdoj.gov)
Office of the U.S. Trustee
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770

Janet M. Nesse, Esquire
(jnesse@mhlawyers.com)
Counsel for Lindholm & Associates
McNamee Hosea Jernigan Kim Greenan
& Lynch, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, Maryland  20770

Paul Sweeney, Esquire
(psweeney@yvslaw.com)
Counsel for Debtor
YVS Law, LLC
11825 West Market Place, Suite 200
Fulton, Maryland  20759

Peggy H Goodman, Esquire
(peggy.goodman@maryland.gov)
Maryland Department of Labor
Legal Services and Collection
1100 North Eutaw Street, Room 401
Baltimore, Maryland  21201

Michael J. Lichtenstein, Esquire
(mjl@shulmanrogers.com)
Counsel for ManpowerGroup
Shulman Rogers Gandal Pordy & Ecker
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland  20854

Jeffrey M. Orenstein, Esquire
(jorenstein@wolawgroup.com)
Counsel for Communication Technologies
Wolff, & Orenstein, LLC
15245 Shady Grove Road
North Lobby, Suite 465
Rockville, Maryland 20850

U.S. Trustee – Greenbelt
(ustpregion04.gb.ecf@usdoj.gov)
6305 Ivy Lane, Suite 600
Greenbelt, Maryland  20770